NOTICE

Decision filed 08/22/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230510-U

NO. 5-23-0510

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 21-CF-799 |
| | ) | |
| DEANTAE M. RICE, | ) | Honorable |
| | ) | James R. Coryell, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Moore* and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not abuse its discretion when it admitted the other-crimes evidence complained of by the defendant where the evidence was admissible under an Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) permissible purpose and where it was not substantially more prejudicial than probative. As a result, the trial court did not commit plain error in admitting this evidence, and defense counsel did not provide ineffective assistance of counsel in failing to object to the admission of this evidence. We therefore affirm the defendant's conviction.

¶ 2    The defendant, Deantae M. Rice, appeals his conviction of one count of unlawful delivery of a controlled substance in violation of section 401(d) of the Illinois Controlled Substances Act (720 ILCS 570/401(d) (West 2020)) by the circuit court of Macon County. He argues that the trial

_____

*Originally Justice Welch was assigned to the panel. Justice Moore was later substituted on the panel and has read the briefs.

1

court committed plain error, and his defense counsel provided ineffective assistance of counsel where the State was allowed to introduce improper and prejudicial other-crimes evidence without objection. For the reasons that follow, we affirm the defendant's conviction.

¶ 3                                    I. BACKGROUND

¶ 4     On July 8, 2021, the defendant was charged with one count of unlawful delivery of a controlled substance in violation of section 401(d) of the Illinois Controlled Substances Act (*id.*), a Class 2 felony. This case centered on an incident that occurred on September 28, 2020, and arose from a larger investigation into suspected drug activity conducted out of a house at 732 West King Street in Decatur, Illinois ("732 West King"). Following the bench trial, which occurred on May 17, 2023, the defendant was found guilty on the single count and sentenced to 24 months' probation.

¶ 5     At trial, Toma Brown testified that in June 2020, he was working as a confidential informant for Detective Chad Ramey of the Decatur Police Department. Brown confirmed that he was getting paid for his work and that he was paid for each completed buy. Brown estimated that he worked as Detective Ramey's confidential informant for "approximately two years." In June 2020, Detective Ramey asked Brown to help him with an investigation into possible illegal drug sales at 732 West King. Before Brown engaged in any work on this case, Detective Ramey showed him three different pictures of people believed to be at the house. Brown made an in-court identification of the defendant as one of the three people shown to him in those pictures.

¶ 6     Brown testified that he first went to 732 West King on June 4, 2020. When he arrived at the residence, the defendant told him not to park in the driveway. Brown clarified that he did not make any type of purchase on this date. He testified that, in total, he attempted to buy drugs at the

2

address "about six or seven times" and that he was successful in these attempts "at least six" times. He clarified that, each time, he was trying to buy "crack cocaine."

¶ 7    Brown confirmed that his first actual buy at 732 West King took place on September 28, 2020. This was also the first date from which the State had video footage. Brown confirmed that he had reviewed this footage before testifying. On that date, Brown met with Detective Ramey before attempting the controlled buy, and he and his vehicle were searched by the police. The police then provided him with $40 to complete the controlled buy. The police also set up audio and video recording equipment and gave it to Brown to try to record the controlled buy. Brown then went to the house. Brown testified that he walked up to the house, was let inside the door, gave the seller $40, and was given crack cocaine by the seller in return. Brown made an in-court identification of the defendant as the seller in question. Brown confirmed that the cocaine had been located "in the back of the house somewhere," and was not "out in the open." After completing the purchase, Brown testified that he returned to Detective Ramey and handed him the crack cocaine.

¶ 8    Brown completed a subsequent controlled buy for Detective Ramey at 732 West King on October 20, 2020. The State also had audio and video footage of this buy. Brown confirmed that, before testifying, he had reviewed that footage. Brown confirmed that he and his vehicle were again searched by police prior to the buy. Brown testified that he initially "had trouble getting into the house" as no one answered the door. However, a truck then pulled up. A man got out of the truck, retrieved a key, and opened the door of the residence for Brown. Brown then realized that there "was somebody else inside" the house, and he "did a transaction" with that person. This second person was a man called "June Bug." Brown made an in-court identification of the defendant as the first man who got out of the truck and opened the door. Brown confirmed that

3

"June Bug," and not the defendant, was the individual from whom he received the cocaine on this date. Brown testified that when he first entered the house on this occasion, he "waited a little bit" before the second man "came out and gave [him] the $60 worth of crack cocaine." Brown then took the crack cocaine back to Detective Ramey. Brown testified that he purchased cocaine from "a total of three" people at the King address. Brown recalled that he purchased cocaine from the two people who were not the defendant about "three or four times."

¶ 9　　Detective Ramey testified that, in January 2023, he had retired from the Decatur Police Department, but that, prior to that date, he had worked there for 27 years. He achieved the rank of "Detective" in 1999 and worked as a detective until his retirement. He worked as part of the Street Crimes Unit, and one of his primary focuses was "illegal narcotics sales." He testified that, throughout his career, he had "used and been a part of probably over a thousand different controlled purchases using confidential sources" like Brown. Detective Ramey testified that standard procedure when utilizing a confidential source in a controlled buy included thoroughly searching the source and their vehicle for contraband and currency beforehand. A separate search of both the person and their vehicle was also conducted after the buy. Detective Ramey confirmed that the searches were completed so that the police could be confident in the evidence collected through the buy. He also confirmed that the Decatur Police Department utilized standard audio and video recording equipment for controlled buys.

¶ 10　　Detective Ramey testified that, beginning around June 2020, the department began receiving complaints from anonymous sources about drug sales at 732 West King. These anonymous sources also gave the department the names of some individuals involved, one of which was the defendant. At this point, Detective Ramey made an in-court identification of the defendant. He confirmed that, as part of his investigation, he obtained a court order allowing him

4

to audio and video record possible drug activity at the residence. After obtaining that court order, Detective Ramey used a confidential source, Toma Brown, to try to perform a video-recorded controlled buy at the address. Detective Ramey confirmed that, as a confidential source, Brown was paid in exchange for Brown's work. Detective Ramey testified that Brown completed roughly "six to seven different buys" at 732 West King.

¶ 11 Detective Ramey confirmed that, before the September 28, 2020, video-recorded controlled buy, he searched Brown and Brown's vehicle. Detective Ramey did not find any type of illegal contraband when he performed those searches. His colleague, Detective Dailey, also set up recording equipment, "which audio and video recorded what happened after Toma Brown *** left [their] presence." At this point, the State introduced its first exhibit, a DVD of the video and audio recordings of the controlled buy from September 28, 2020. The DVD also contained "some still photos" that had been captured from the recording "to get a good look at the person who was selling the drugs." Detective Ramey confirmed that there were no edits or manipulations made to the audio, video, or photographs. Defense counsel objected, arguing that Detective Ramey was not present during the recording and therefore would not know whether the video accurately depicted the recorded event. The trial court overruled this objection, finding that sufficient foundation for the video had been laid by Detective Ramey's testimony that the department utilized standard police equipment and by Brown's testimony that he had been the one recording the video.

¶ 12 At this point, the video was played for the trial court. The full video recording is 16 minutes and 28 seconds long. Due to its length, only certain portions were played for the court. This court has independently reviewed each section of the video that was played for the trial court. The first section played was from the beginning to 1 minute, 44 seconds. During this section, the video showed a bald man with black-framed glasses and a gray beard in an outdoor area adjusting the

5

camera in front of him, which was ostensibly attached to the confidential source's front body. A separate, unseen man began to speak. He identified the time as "approximately 15:18 hours," and clarified that they were in the Decatur, Macon County, Illinois, area. He identified himself as Detective Chad Ramey and explained that they were conducting an authorized controlled buy of narcotics at 732 West King. The confidential source, also unseen, then identified himself and gave consent to be recorded. Detective Ramey then told the confidential source to follow him in the source's vehicle. The confidential source entered his vehicle, a BMW.

¶ 13     The second section played was from 8 minutes, 55 seconds to 10 minutes, 38 seconds. In the video, the confidential source approached a white house and climbed a small set of wooden stairs to enter a front porch area. He approached a black door with a screen, behind which was a black man wearing a white T-shirt with a full beard and slightly longer than shoulder-length dreadlocks kept behind his ears. The confidential source then said "forty" to the man behind the door, and the man let the source inside. The black man appeared to be speaking to someone on the phone, although we cannot clearly see a phone to his ear or in his hand. The man then walked toward the back of the house, seemingly to retrieve something, and when he returned, he seemed to hand the item over to the confidential source. At no point during the video do we see what it was that the man ostensibly retrieved and handed over to the confidential source. The source then turned around and left through the door in which he entered. The source walked away from the residence, down the street, and entered his car. While walking, he commented to someone (possibly believing that Detective Ramey could hear him live) that it "was a good deal," although he expressed that he was unsure if the other person could even hear him.

¶ 14     The last section played was from 15 minutes, 31 seconds to the end of the video. The confidential source was playing music in his car while driving. He pulled to the side of a white

6

building, where both officers from before were standing outside, waiting for him. He exited the vehicle. Detective Ramey can be seen in the shot. Detective Ramey recorded the time as "15:33 hours" and stated that they were back with the confidential source. The other officer (not Detective Ramey) then began to adjust the camera on the confidential source's body, ostensibly preparing to remove the equipment. The video then ended. At this point, the State clarified that this was one video "showing one angle."

¶ 15    The State then played a second video of the same encounter. This entire video was 11 minutes and 20 seconds. Due to its length, only one portion of the video was played for the trial court. This court has independently reviewed that section. The section played was from 4 minutes to 6 minutes, 30 seconds. In the video, the confidential source exited his vehicle and walked up the street toward the white house seen earlier. The camera was either attached to the source's body or held in his hand and was recording upside-down. As seen in the prior video, the confidential source climbed a small set of wooden stairs to enter a front porch area. He approached a black door with a screen. In this video, the camera was placed too low to see anyone behind the screen. The confidential source then said "forty" to the door, and a black man behind the door let him in. In this video, the black man's face cannot be seen. However, we can see his body from the back as he walked away toward the back of the house. The man was wearing light brown boots, dark jeans or sweatpants, and a white T-shirt. He had the same dreadlocks, which were slightly down past his shoulders and kept behind his ears. As in the previous video, the black man appeared to be speaking to someone on the phone. Here, however, we can see that he appeared to be holding a phone in his left hand.

¶ 16    The man walked toward the back of the house. In this video, the man can clearly be seen retrieving something from a table or kitchen counter at the back with his right hand. The man then

7

turned back around (at which point, his full beard could be seen) and clearly handed the item to the confidential source. At no point during the video are we able to see exactly what it was that the man retrieved and handed over to the source, although we can see that it is clearly something small and able to be carried in one hand. The source then turned around and left, walked away from the residence, and entered his car. As in the previous video, the source commented to someone as he walked (possibly believing that Detective Ramey could hear him live) that it "was a good deal," although he expressed that he was unsure if the other person could hear him.

¶ 17    The State then showed still photographs taken from the videos to the trial court, which this court has independently reviewed. The photographs show still images of the seller from the September 28, 2020, controlled buy. As in the videos, the seller was wearing a white T-shirt, dark jeans or sweatpants, and light brown boots. He had a phone in his left hand. He had a full beard and dreadlocks that were slightly longer than shoulder-length and kept behind his ears.

¶ 18    At this point, the State resumed its questioning of Detective Ramey. Detective Ramey testified that, after Brown returned from 732 West King on September 28, 2020, Brown met with Detective Ramey and his colleague and "turned over a quantity of crack cocaine, which was secured." Then, Brown and his vehicle were searched. The State then moved to admit and publish its second exhibit into evidence, which, according to the record, was the crack cocaine bought on September 28, 2020, and secured by police. The court asked defense counsel if he had any objection to this, and defense counsel responded that he did not.

¶ 19    Detective Ramey testified that he attempted to use Brown to make a controlled buy at 732 West King on October 20, 2020. Detective Ramey confirmed that he utilized the same procedure to search Brown and his vehicle beforehand, set up video and audio recording equipment, and provided currency to Brown for the buy. Detective Ramey did not find any illegal drugs upon

searching Brown or his vehicle. After the equipment was set up, Brown attempted the controlled buy at the King address. At this point, the State moved to introduce its third exhibit, a DVD of the audio and video recordings of the controlled buy from October 20, 2020, into evidence. Detective Ramey confirmed that he had reviewed the recordings on the DVD in preparation for trial and to verify that the DVD contained the correct recordings. Detective Ramey testified that he had used standard Decatur Police Department recording equipment in recording the October 20, 2020, controlled buy. Detective Ramey also confirmed that there were no edits or manipulations made to the recordings. The trial court asked defense counsel if he had any objection to the exhibit's admission, and defense counsel answered that he had no objection.

¶ 20    The video from the DVD was then played for the trial court. This entire video was 26 minutes and 20 seconds. Due to its length, only one portion of the video was played for the court. This court has independently reviewed that portion. The portion played was from 11 minutes, 30 seconds to 21 minutes, 3 seconds. The video, which was recorded upside-down, began with the confidential source waiting on the front porch of the white house. The source knocked repeatedly on the house's black front door, but no one answered the door. The source waited, and at 13 minutes, 40 seconds in the video, a white truck pulled up to the residence. A black man with a full beard could be seen sitting in the driver's seat of the white truck. An older black man walked up to the driver's side of the truck and made an inquiry, which could not be clearly heard. At this point, the source, who remained standing on the front porch, explained to the driver that, although he had repeatedly knocked on the door, no one had answered. He knocked on the door again, demonstrating the lack of response for the driver.

¶ 21    A car door then slammed, and when the camera showed the driver's seat of the truck again, it was empty. The older man walked up to join the source on the front porch. Together, they waited

9

and chatted on the front porch. After a little while, the driver emerged from behind the white truck. He was a black man with a full beard and dreadlocks that were slightly longer than shoulder-length and kept behind his ears. The driver climbed the wooden steps and approached the house's door. Although we do not see what happens next, when the camera centered on the door of the house again, it had swung open, and the driver, the older black man, and the confidential source all entered the house. The driver could be seen walking further into the house. He called out, "June Bug!" When he could not immediately find "June Bug," he returned to the front of the house and instructed someone else to find and get "June Bug." He asked the confidential source how much he had, to which the source answered, "sixty." The driver instructed the source to "sit down" and wait.

¶ 22    The source approached a brown sofa in an adjacent room and sat down. The older man also waited, leaning on a doorframe directly in front of the source. After a while, the older man exited the room, entering the front room again, and shouted, "Hey!" He then conversed with an unseen individual and reentered the adjacent room. He told the source that someone was "going to grab it." The men waited together in the adjacent room for a while. They then walked into a third room and gathered around a table, onto which the source placed his cash. The seller, ostensibly called "June Bug," was an older black man who looked to be cleanshaven and was wearing a black beret. He reached into a clear plastic bag filled with white balls and pulled them out. He put on a pair of glasses and began to separate out the white balls. He then said, "there you go" to the confidential source. Although we do not see the actual exchange of goods on camera, we see that the seller began to assist another person as the source headed for the door and exited the house. As the source walked away from the house, he stopped in front of the driver's side of the white truck and conversed a bit with the driver, whose face we do not see on camera. He informed the driver that

10

"June Bug" was now inside the house serving customers. He then continued walking down the road away from the house.

¶ 23     The State then moved to introduce its fourth exhibit, a collection of still photographs taken from the video recording of the October 20, 2020, controlled buy into evidence. Defense counsel had no objection, and the exhibit was admitted. The first still photograph showed the white truck pulling up to 732 West King, and the driver in the driver's seat, who was a black man with a full beard. The second and third photographs showed the driver after he walked around the back of the white truck, and just before he was about to come up the stairs of the residence. Here, his full beard and medium-long dreadlocks are visible. The fourth and fifth photographs showed the seller reaching into a plastic bag with white balls inside. The seller was an older black man, and he was wearing a black beret.

¶ 24     On cross-examination, Detective Ramey confirmed that the defendant was not visible on camera inside the house at the time of the transaction. He testified that, although the defendant seemed to be outside the house at that time, he "had arrived and unlocked the front door with the key and allowed those two gentlemen inside that were waiting to purchase." Detective Ramey confirmed that another individual from the October 20, 2020, video, was also arrested and prosecuted pursuant to the investigation into the 732 King address. Detective Ramey also confirmed that the confidential source was "being compensated from each buy that he did from 732 West King."

¶ 25     At this point, the parties stipulated that an uncalled witness, Josh Stern, who was employed by the State Police Crime Laboratory, would testify that the substance retrieved from the confidential source by police after the September 28, 2020, buy, was "a substance containing

11

cocaine" that weighed "less than 0.1 gram." The defendant declined to present any evidence, and closing arguments were presented.

¶ 26 In its oral ruling, the trial court discussed the September 28, 2020, video and photographs, but never mentioned the video or photographs from October 20, 2020. The trial court commented that, in the September 28, 2020, video, other than the confidential source, "somebody that [looked] a whole lot like [the defendant was] the only other person there at the time." The trial court considered the searching procedures testified to by Detective Ramey, the paid nature of Brown's work, and the fact that police only found cocaine on Brown after the interaction had taken place. The trial court stated that "the only conclusion [it could] draw [was] that the State [had] proved beyond a reasonable doubt that [the defendant] sold the cocaine to Toma Brown in September of 2020." The trial court therefore found the defendant guilty of delivery of a controlled substance.

¶ 27 On July 6, 2023, the trial court sentenced the defendant to 24 months' probation. The defendant was also ordered to undergo a substance abuse evaluation and pursue any recommended treatment. This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29 On appeal, the defendant argues that this court should reverse his conviction and remand for a new trial because the trial court committed plain error, and defense counsel provided ineffective assistance of counsel where the State was allowed to introduce improper and prejudicial other-crimes evidence without objection. We first review the threshold issue of whether the trial court erred in admitting the other-crimes evidence.

¶ 30                        A. Admission of Other-Crimes Evidence

¶ 31 Every criminal defendant is entitled to have his guilt or innocence determined through a fair and impartial trial. See U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. To protect that

right, evidence of other crimes or bad acts for which a defendant is not on trial is ordinarily inadmissible to establish the defendant's propensity to commit crimes. See Ill. R. Evid. 404 (eff. Jan. 1, 2011); *People v. Pikes*, 2013 IL 115171, ¶ 11. However, Illinois Rule of Evidence 404(b) permits other-crimes evidence to be introduced for other purposes, including "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Even if offered for a permissible purpose, however, other-crimes evidence is inadmissible under Rule 404(b) if its probative value is substantially outweighed by its prejudicial effect. *Pikes*, 2013 IL 115171, ¶ 11. A trial court's decision to admit other-crimes evidence is reviewed for an abuse of discretion. *People v. Ward*, 2011 IL 108690, ¶ 21. "An abuse of discretion occurs when the ruling is arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view." *Id.*

¶ 32 On appeal, the defendant argues that the trial court abused its discretion in allowing the State to introduce other-crimes evidence of a recorded controlled purchase other than the one for which he was charged. Specifically, the State was allowed to introduce video and photographic evidence of the October recorded controlled purchase, even though the defendant was only charged in connection with the September purchase.

¶ 33                                 1. *Permissible Purpose*

¶ 34 Both parties agree that, although the State did not explicitly state a purpose for the October controlled purchase evidence, and defense counsel did not object to this, the October evidence clearly was offered to help with the identification of the defendant as the seller from the September transaction. The defendant argues that the October evidence was improperly admitted, however, because the October incident took place after the charged offense, and other-crimes evidence from a later transaction cannot logically bolster the accuracy of a prior identification. Thus, the October

13

evidence was ineligible to be admitted for identification purposes regarding the September transaction, and, as the evidence was irrelevant to any other permissible purpose, the trial court abused its discretion in allowing its admission at all.

¶ 35    In support of this argument, the defendant cites to *People v. Rosado*, 2017 IL App (1st) 143741, claiming that, in that case, the First District Appellate Court held that other-crimes evidence from a later transaction cannot bolster the accuracy of a prior identification, cannot contribute to the State's identification of defendant in a prior transaction, and thus, had been improperly admitted by the trial court for that purpose. To the extent that *Rosado* can be interpreted as saying this, we disagree. However, after reviewing *Rosado*, we do not believe that to be the case's true, full holding.

¶ 36    In *Rosado*, defendant was charged with delivery of narcotics. *Id.* ¶ 3. To help identify defendant as the person who delivered narcotics to an undercover officer, the State submitted eyewitness testimonial evidence of a later, uncharged transaction that occurred six days after the charged offense. *Id.* ¶ 5. Notably, unlike in the case at bar, *Rosado* makes no mention of any video evidence being presented; seemingly, the evidence depended primarily on the eyewitness testimony and recollection of the officers. Considering the specific facts of the case, the appellate court found that, in this particular instance, the trial court had abused its discretion in admitting evidence of the later transaction because "officers did not explain how their ability to recognize" defendant during the earlier transaction had been "somehow increased based on what they saw six days later." *Id.* ¶¶ 25-26. We do not believe, after reviewing the case, that the *Rosado* court intended to make as broad a ruling concerning the relevance of later other-crimes evidence to identification purposes as the defendant claims here.

14

¶ 37    We agree with the State that a determination of whether later other-crimes evidence can be offered to establish identity should be made on a case-by-case basis. For example, in *People v. Johnson*, 2020 IL App (1st) 162332, the First District held that "the reasoning in *Rosado* [was] not relevant to the case at bar," and that, "[a]t any rate, the holding in *Rosado* certainly [did] not suggest that evidence of other crimes that occurred after the charged offense [was] 'categorically irrelevant' to prove identity as defendant suggest[ed]." *Id.* ¶ 49. The *Johnson* court interpreted *Rosado* to merely hold that, "under the circumstances in that case, the evidence was not relevant to bolster the identification of that witness." *Id.* We agree and find that later other-crimes evidence can be offered to establish identity, depending on the circumstances of the individual case.

¶ 38    In the case at bar, the other-crimes evidence of the October incident was relevant for identification purposes. The evidence offered of both the charged crime and the later October incident were in the forms of witness testimony, photographs, and videos. If the evidence had solely relied on eyewitness testimony and recollection, the reasoning in *Rosado* might be more relevant here. However, that was not the case. Instead, the State provided videos and photographs to directly compare the individual in the later incident to the individual in the earlier incident. Therefore, the later other-crimes evidence was relevant for identification purposes.

¶ 39                                  2. *Prejudicial vs. Probative*

¶ 40    Additionally, the probative value of the other-crimes evidence was not "substantially outweighed by its prejudicial effect." *Pikes*, 2013 IL 115171, ¶ 11. The defendant admits that "the evidence from the October controlled purchase did not show that the man alleged to be [the defendant] participated in the illicit transaction" recorded on that date. He admits that the man alleged to be him "did not talk with [the confidential source] about any transaction[,] nor did he handle any of the money or suspected narcotics" allegedly transferred on that date. Rather, the

15

evidence from the October purchase was offered simply to compare the faces of the driver in the October video and the seller in the September video. Furthermore, in its ruling, the trial court never even mentioned, let alone discussed, the evidence from the October controlled purchase. Clearly, the evidence's probative value was not substantially outweighed by its prejudicial effect. Thus, the trial court did not abuse its discretion in admitting the later other-crimes evidence from the October controlled purchase.

¶ 41                                    B. Plain Error

¶ 42     Generally, a defendant forfeits review of any supposed error if he does not object at trial and raise the issue in a posttrial motion. See *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). The plain-error doctrine allows a reviewing court to consider unpreserved error when a clear or obvious error occurs and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. See *id.* at 565; Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Here, the defendant claims that, although defense counsel failed to object to the introduction of the October other-crimes evidence at trial, this court may still review the evidence's admission, as the trial court committed plain error under the closely balanced evidence prong. However, as we have thoroughly discussed above, the trial court did not err at all, let alone err in a clear or obvious way, in admitting the October evidence. As a result, the defendant's plain error claim fails. See *Piatkowski*, 225 Ill. 2d at 565 (the first step of plain error analysis is to determine whether error occurred).

¶ 43     Furthermore, even if the trial court *had* clearly and obviously erred in admitting the October evidence, the defendant's plain error claim would still fail, as the evidence was not so closely balanced that the error alone would have threatened to tip the scales of justice against him. After

thoroughly reviewing the evidence in this case, we find that the September controlled purchase evidence, which included videos, photographs, and testimony, was more than adequate to convict the defendant on its own. The September videos and photographs clearly show the seller's face, body, clothing, and hairstyle multiple times. The seller's voice can be heard in the videos. In one of the videos, the seller can clearly be seen retrieving something and handing the item over to the confidential source. Brown testified that, before he went out to attempt the September buy, he and his vehicle were searched by the police. Detective Ramey confirmed this procedure in his testimony. Both parties stipulated that an uncalled witness, Josh Stern, who was employed by the State Police Crime Laboratory, would testify that the substance retrieved after the September buy was less than 0.1 gram of cocaine. Additionally, as mentioned above, in its final ruling, the trial court never even mentioned, let alone discussed, the evidence from the October controlled purchase. Therefore, we cannot find that the evidence was so closely balanced that the hypothetical error alone would have threatened to tip the scales of justice against the defendant. Accordingly, the defendant's plain error claim again fails.

¶ 44                          C. Ineffective Assistance of Counsel

¶ 45     A criminal defendant is guaranteed the right to the effective assistance of counsel under the United States and Illinois Constitutions. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984). To prevail on an ineffective assistance of counsel claim, the defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness and (2) that the deficiency in counsel's performance was prejudicial to the defense. See *Strickland*, 466 U.S. at 687. To prove prejudice, the defendant must show that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Coleman*, 2015 IL App (4th)

17

131045, ¶ 80 (quoting *Strickland*, 466 U.S. at 694). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). Here, the defendant claims that defense counsel provided ineffective assistance of counsel in failing to object to the admission of the October evidence. However, as we have thoroughly discussed above, the trial court did not err in admitting the October evidence. As a result, in failing to object to its admission, defense counsel's performance did not fall below an objective standard of reasonableness. The defendant's ineffective assistance of counsel claim thus fails.

¶ 46    Furthermore, even if defense counsel's failing to object to the admission of the evidence *had* fallen below an objective standard of reasonableness, the defendant's ineffective assistance of counsel claim would still fail, as the hypothetical deficiency in counsel's performance would not have been prejudicial to the defense. After thoroughly reviewing the evidence in this case, we do not find that, but for counsel's hypothetical unprofessional error, the result of the proceeding would have been different. Indeed, as detailed above, the September controlled purchase evidence, which included videos, photographs, and testimony, was more than adequate to convict the defendant on its own. Thus, the defendant's ineffective assistance of counsel claim again fails.

¶ 47                                   III. CONCLUSION

¶ 48    The trial court did not abuse its discretion in admitting the other-crimes evidence, as it was admissible under an Illinois Rule of Evidence 404(b) permissible purpose and was not substantially more prejudicial than probative. As a result, the trial court also did not commit plain error in admitting the other-crimes evidence, and defense counsel did not provide ineffective assistance of counsel in failing to object to its admission. Therefore, the order of the circuit court of Macon County convicting the defendant of unlawful delivery of a controlled substance is hereby affirmed.

¶ 49    Affirmed.

18